**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MIJO KOMSO**, | : | Case No. 1:13CV00715 |
| Plaintiff, | : | |
| vs. | : | **MEMORANDUM DECISION AND ORDER** |
| **COMMISSIONER OF SOCIAL SECURITY**, | : | |
| Defendant. | : | |

**I. INTRODUCTION.**

In accordance with the provisions of 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, the parties consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in this case (Docket No. 20). Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for continuing disability insurance benefits (DIB). Pending before the Court are Briefs on the Merits filed by both parties (Docket Nos. 15 & 16). For the reasons that follow, the Magistrate Judge affirms the Commissioner's decision.

**II. PROCEDURAL BACKGROUND.**

Plaintiff applied for DIB on December 17, 2003, alleging that his disability began on September 7, 2002, due to a back injury (Tr. 63-65, 98). The application for DIB was denied initially on February 10, 2004 (Tr. 45-48) and upon reconsideration on May 27, 2004 (Tr. 50-52). On July 20, 2006, Administrative Law Judge (ALJ) Morley White conducted a hearing and

determined, with reservations, that Plaintiff was disabled as of September 7, 2002, because of degenerative disc disease (DDD), osteoarthritis and pain behavior[1] (Tr. 215-217; 295). On August 3, 2006, ALJ White flagged Plaintiff's case for investigation[2] (Tr. 295), and on April 27, 2007, the case was reopened and revised[3] (Tr. 210-213; 219-220). An investigation was completed by the CDIU of the Office of the Inspector General (OIG) on November 9, 2007 (Tr. 286-289). Subsequently, on June 27, 2008, a notice of disability cessation was forwarded to Plaintiff (Tr. 225-227) and the decision denying continued benefits was affirmed upon reconsideration on March 17, 2010 (Tr. 243-244). ALJ Patrick Rhoa conducted an administrative hearing on May 12, 2011, at which Plaintiff, his counsel, Vocational Expert (VE) Gene Burkhammer and Interpreter, Daniel Vujicic, appeared (Tr. 436). On August 9, 2011, ALJ Rhoa issued an unfavorable decision and on February 4, 2013, the Appeals Council denied Plaintiff's request for review (Tr. 9-11 and 17-27).

---

[1] The ALJ found that Plaintiff was unable to complete an 8-hour work day, five days a week in a competitive work setting on a sustained basis. The ALJ (1) stipulated that Plaintiff's receipt of benefits was conditioned on ongoing psychological counseling and (2) forwarded the file to the Cooperative Disability Investigations Unit (CDIU) (Tr. 247).

[2] In a letter to the OIG, ALJ White explained that he decided the case in Plaintiff's favor despite the fact that he did not believe him. During the hearing, Plaintiff displayed over-reactive pain behavior during the final hearing on July 20, 2006 even though the medical expert testified that there was no objective medical evidence to support the claim of pain. The record showed that Plaintiff presented to every doctor's appointment with a walker and testified that he needed it to ambulate. Yet on other occasions he used a cane. Without such pain or the constant use of a walker, ALJ White was persuaded that Plaintiff was not disabled. ALJ White explained that he had reservations about the veracity of his allegations and he explained that he was placing him under surveillance. He further suggested that Plaintiff had been awarded a personal injury jury verdict which was possibly based on misrepresentations (Tr. 295).

[3] ALJ White averred that he did not have a complete record before him but based on evidence from the state agency physician, treating doctors and medical expert, Plaintiff was unable to sustain eight hours a day, five days a week in a competitive workplace and therefore, he was unable to do his past relevant work or any other work that exists in significant numbers in the national and regional economies. Under oath, Plaintiff agreed to seek and obtaining psychiatric or psychological counseling (Tr. 210-213).

### III. FACTUAL BACKGROUND.

#### A. PLAINTIFF'S TESTIMONY.

Plaintiff attended school in the former Yugoslavia. He completed the eighth grade and four years of vocational training which focused on factory work. He testified that his math skills were outstanding ; however, he had great difficulty reading, writing and speaking English (Tr. 456-457). While he could read numbers printed in English, he could not write them in English (Tr. 457). He watched television to process the few English words and phrases that he knew. He could not properly communicate in English (Tr. 445). To obtain a valid driver's license, Plaintiff took the written examination in German and the driving examiner gave him basic oral instructions which he was able to comprehend (Tr. 443- 445). Occasionally, he drove his children to school (Tr. 458). Plaintiff had vacationed in Croatia three times for several months each trip (Tr. 447).

Income for Plaintiff and his family was derived from his rental properties. Because of his inability to communicate in English, he rarely talked to his tenants. His daughter managed the properties (Tr. 445-446). Plaintiff suggests that the disability investigator's contacts with his tenants caused them to move (Tr. 447-448). Without rental income, Plaintiff testified that he was unable to make home equity loan payments for his properties, to pay his medical bills and to support his family. He borrowed approximately $140,000 to pay his children's tuition and medical bills (Tr. 449-450).

Plaintiff was last employed doing milling using a CNC machine for Enterprise Welding (Tr. 462). He started working there in 1998 or 1999 and continued to work there for five years. September 9, 2002 was his last day at work because on the following day when he tried to get up, he was unable to do so (Tr. 463). Prior to his surgery, Plaintiff testified that he could not walk at all; however, the surgery helped him and he could, at least move for a few minutes at a time (Tr.

3

469). Plaintiff's wife worked outside the home in a factory that manufactured aircraft parts. Plaintiff was a beneficiary of his wife's health insurance coverage; however, few specialists would accept such coverage (Tr. 460; 461). When describing his physical impairments, Plaintiff claimed that after 20 to 30 minutes of doing anything he had to lie down. Occasionally he fainted. His left leg was chronically numb and painful and his spine hurt constantly (Tr. 467). Plaintiff estimated that he could not stand for more than 20 to 30 minutes; his back hurt if seated for more than 15 minutes (Tr. 467-469). Walking and/or exercise agitated his pain. Walking with a cane helped him feel stronger (Tr. 468).

**2.    VE TESTIMONY**

The VE acknowledged that: (1) he had a role as an impartial witness; (2) he had no prior communication with the Plaintiff; (3) he was familiar with the evidence pertaining to Plaintiff's vocational status, and (4) he understood the duty to advise of any conflict between his opinion and the information in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country (Tr. 470; www.occupationalinfor.org.).

Initially, the VE categorized Plaintiff's past relevant work of a CNC machine operator, as medium work which involved lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. The specific vocational preparation level or the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance of a CNC machine operator, was more than two years, up to and including four years
 (Tr. 470-471).

The ALJ posed the *first* hypothetical question:

4

Assume an individual of Plaintiff's age, education and vocational background, who would be able to perform light work with no climbing of ramps or stairs, no hazards, which means no work at unprotected heights, no work around dangerous machinery. The claimant would have one additional and unscheduled break of five to ten minutes per day.

The VE responded that at the light level, the following jobs were available to the hypothetical person and that even if the hypothetical person was off task 5% of the time, this hypothetical person could perform such jobs after a short demonstration up to and including one month of training:

| JOB/DOT NUMBER | NUMBER OF JOBS LOCALLY/OHIO/NATIONALLY |
| --- | --- |
| Housekeeping cleaner 323.687-014 | 2,000/30,000/500,000 |
| Food service worker 311.477-014 | 600/5,000/100,000 |
| Mail clerk 209.687-026 | 500/6,000/160,000 |

(Tr. 471-472).

The ALJ posed a *second* hypothetical question:

Assume the same individual, same age, same education and background, and same residual functional capacity (RFC) except that this individual would be limited to performing with a sit/stand option every hour. Would this person be able to perform any of Plaintiff's past work?

The VE answered that this hypothetical person could not perform Plaintiff's past work but he or she could perform the following work after a short demonstration up to and including one month of training:

| JOB/DOT NUMBER | NUMBER OF JOBS LOCALLY/OHIO/NATIONALLY |
| --- | --- |
| Bench assembler 706.684-042 | 500/6,000/100,000 |
| Addresser 2909.587-010 | 300/3000/60,000 |
| Food & beverage order clerk 209.567–010 | 300/4,000/90,000 |

5

(Tr. 472-473).

The VE explained that being off task more the 15% of the workday exceeded the acceptable limits where no jobs were available (Tr. 473).

In response to counsel's inquiry, the VE explained that if the hypothetical person ambulated with a cane and required a sit/stand option, the light work examples would be eliminated from the pool of possible jobs that the hypothetical person could perform. The VE further estimated that the number of jobs previously given would be reduced by 25% if the employee required an additional break (Tr. 474).

Counsel handed the VE Exhibit B-F (Tr. 183-185) and asked him to consider the following functional limitations: (1) sitting for two hours; (2) standing and walking for two hours; (3) lifting a maximum of 10 pounds; and (4) probable absences totaling three times monthly. The VE opined that these conditions would exceed what is typically permitted of an unskilled worker to remain competitive (Tr. 475).

### IV. MEDICAL EVIDENCE.

Plaintiff's relevant medical issues date back to September 2002, when he sustained a non-work related injury. Dr. Howard Lee, M. D., a critical care specialist, diagnosed Plaintiff with left radiculopathy and degenerative disc disease, treated Plaintiff for these diseases and provided Plaintiff with an excuse for absences from work from September 16, 2002 through January 31, 2003 (Tr. 110-116; www.healthgrades.com/physician/dr-howard-lee).

Dr. Dale E. Braun, M. D., a neurosurgeon, conducted an initial consultation on September 24, 2002 and ultimately performed surgery on Plaintiff's displaced disk on January 6, 2003. The results from radiological tests administered on June 29, 2004, identified post-surgical changes of the lower lumbar spine above the fusion of the L4 through S1 vertebrae. More important, they identified

possible grade retrolisthesis of L4 on L5 but no abnormal motion with flexion or extension. Dr. Braun discharged Plaintiff from his care on June 29, 2004, and advised Plaintiff to contact him should any problems arise (Tr. 117-138; 140-159; 180-182; www.healthgrades.com/physician/dr-dale-braun).

Dr. Jerome B. Yokiel, M.D., an anesthesiologist, evaluated Plaintiff on July 22, 2003, and confirmed that he had lumbar radiculopathy and "post laminectomy syndrome, lumbar." Through June 2, 2009, Plaintiff presented periodically to Dr. Yokiel with weakened lower extremities. Dr. Yokiel noted that Plaintiff walked in a manner to avoid pain and he generally used a walker to ambulate. However, there was typically no evidence of neurological or sensory deficits. Dr. Yokiel continued to monitor and manage Plaintiff's pain, prescribing a regimen of pain medication that had few side effects and a TENS unit as well as periodically employing nerve root injections. Plaintiff contended that none of these treatment modalities successfully controlled his chronic pain (Tr. 160-164; 186-194; 378-402; www.healthgrades.cm/physisican/dr-jerome-yokiel).

Dr. Maria Congbalay, M. D., a blood banking and transfusion medicine specialist, completed a current evaluation of Plaintiff's physical residual functional capacity (RFC) on February 3, 2004, and found that:

1. Plaintiff could lift/carry twenty pounds occasionally.
2. Plaintiff could lift/carry ten pounds frequently.
3. Plaintiff could stand and/or walk about six hours in an 8-hour workday.
4. Plaintiff could sit about six hours in an 8-hour workday.
5. Plaintiff could push and pull on an unlimited basis.
6. Plaintiff could never climb using a ladder, rope or scaffolds; but he could occasionally climb using a ramp or stairs.
7. Plaintiff could frequently balance, stoop, kneel, crouch and crawl (Tr. 167-172; www.healthgrades.com/physician/dr-maria-congbalay).

On April 29, 2004, Dr. Lynne A. Torello, M.D., a general practitioner, considered all of the evidence and using her reasoned judgment, determined that:

7

1. Plaintiff could lift/carry ten pounds occasionally.
2. Plaintiff could lift/carry ten pounds frequently.
3. Plaintiff could stand and/or walk at least two hours in an 8-hour workday.
4. Plaintiff could sit about six hours in an 8-hour workday.
5. Plaintiff could push and pull on an unlimited basis.
6. Plaintiff could never climb using a ladder, rope or scaffolds; crawl; crouch or kneel.
7. Plaintiff could occasionally climb using a ramp or stairs.
8. Plaintiff could occasionally balance or stoop, kneel, crouch and crawl (Tr. 173-178; www.healthgrades.com/physician/dr-lynne-torello).

On February 15, 2006, Dr. Yokiel completed a physical RFC, finding that:

1. Plaintiff had the maximum ability to lift/carry ten pounds occasionally.
2. Plaintiff had the maximum ability to lift/carry less than ten pounds frequently.
3. Plaintiff could stand and/or walk less than two hours in an 8-hour workday.
4. Plaintiff could sit less than two hours in an 8-hour workday.
5. Plaintiff needed to lie down at times during a work shift.
6. Plaintiff could reach, handle, finger and feel frequently and he could push/pull occasionally.
7. Plaintiff needed to shift positions even when sitting (Tr. 183-185).

At the request of the BUREAU OF DISABILITY DETERMINATION, Dr. Naomi Waldbaum, M. D., a physical medication and rehabilitation specialist, conducted an evaluation on March 1, 2006. She could not adequately examine Plaintiff due to his pain behavior (Tr. 195-206; www.healthgrades.com/physician/dr-naomi-waldbaum).

On September 19, 2006 and October 3, 2006, Dr. Ken Gerstenhaber, Ph. D., a psychologist, conducted clinical evaluations, during which he administered the Beck Depression Inventory II, a self-report inventory measuring the severity of one's depression. Plaintiff did not present significant psychological factors that appeared to be affecting his experience of pain or limitation of functioning. There was no evidence of significant depression (Tr. 348A).

Results from a magnetic resonance imaging (MRI) conducted on December 20, 2007, showed vertebral bodies in anatomic alignment, fatty degenerative end-plate changes at the L4-5 level, postoperative soft tissue changes and edema but no abnormal fluid collections. There was no

evidence of recurrent bulge or herniation at L4-5 or L5-S1. Generally, there was normal postoperative appearance of the lumbar spine (Tr. 350-352).

Dr. Michael B. Leach, Ph. D., a clinical psychologist, conducted an interview on April 7, 2008 and made the following diagnoses using the DIAGNOSTIC AND STATICAL MANUAL OF MENTAL DISORDERS paradigm to categorize how Plaintiff's life was impacted by his mental health:

| AXIS AND WHAT IT MEASURES: | DR. LEACH'S DIAGNOSES: |
|---|---|
| One represents what is typically thought of as a diagnosis (e.g., depression) | Psychological factors affecting medical condition. |
| Two assesses developmental disorders and personality disorders. | No diagnoses. |
| Three describes physical problems that may be relevant to diagnosing and treating mental disorders. | Defer to medical examination-back pain reported. |
| Four assesses psychosocial and environmental factors contributing to the disorder. | Health problems and functional limitations. |
| Global Assessment of Functioning (GAF) assigns a clinical judgment in numerical fashion to the individual's overall functioning level. Impairments in psychological, social and occupational/school functioning are considered. The scale ranges from zero (inadequate information) to 100 (superior functioning). | 51--Moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers) (Tr. 356). |

Furthermore, Dr. Leach concluded that:

1. Plaintiff's mental ability to relate to others, including fellow workers and supervisors, was moderately impaired due to the psychological factors affecting his medical condition.
2. Plaintiff's mental ability to understand, remember and follow instructions was moderately impaired.
3. Plaintiff's mental ability to maintain attention, concentration, persistence and pace to perform simple repetitive tasks was moderately impaired by his agitation.
4. Plaintiff's mental ability to withstand the stress and pressures associated with day-to-day work activity was moderately impaired due to his psychological factors affecting his physical condition and agitation.
5. Plaintiff did not have the mental ability to manage his funds if any monies were awarded due to his lack of English and reading skills (Tr. 357).

The PSYCHIATRIC REVIEW TECHNIQUE completed by Dr. Roy Shapiro, Ph.D., on January 9,

2009, showed no coexisting non-mental impairments.  Accordingly, there was insufficient evidence to determine the degree of functional limitations arising therefrom (Tr. 359-369).

Plaintiff was referred for vertigo to Dr. Mark B. Rorick, M. D., and on November 10, 2009, he reviewed Plaintiff's systems, medical records and medical history.  Dr. Rorick suspected that Plaintiff's dizziness was psychogenic (Tr. 412-4143).

Plaintiff returned to Dr. Yokiel on March 1, 2010, complaining of lower back pain which radiated down to his left lower extremity.  Plaintiff continued to ambulate with a walker and Dr. Yokiel continued Plaintiff's medications subject to a random urine screen (Tr. 408).  Dr. Yokiel saw Plaintiff on June 1, 2010, September 29, 2010 and January 27, 2011 and during each visit, Plaintiff complained that his pain was worsening although neurologically, he was intact.  Dr. Yokiel continued the pain reliever regimen supplemented with a corticosteroid hormone (Tr. 405-408). Then on May 8, 2011, Dr. Yokiel provided counsel with a letter of support, verifying that Plaintiff's pain was legitimate, that he used a cane to ambulate and that his complaints were genuine (Tr. 410).

### V. STANDARD FOR DETERMINING CONTINUED DISABILITY.

**1.     THE INITIAL DETERMINATION.**

When a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where he or she is able to perform substantial gainful activity.  *Compton v. Commissioner of Social Security*, 2014 WL 315525, *7 (N.D.Ohio,2014) (*citing* 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F.App'x 761, 764 (6th Cir.2007)).  Whether an individual's entitlement to benefits continues, depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work."  *Id.* (*citing* 20 C.F.R. §§ 404.1594(b), 416.994(b)).

The cessation evaluation process is a two-part process. *Id.* (*See Kennedy*, 247 F.App'x at 764–65). The first part of the process focuses on medical improvement. *Id.* (*citing Kennedy*, 247 F.App'x at 764). The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Id.* (*citing Kennedy*, 247 F.App'x at 764–65) (*citing* 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the individual's] impairment(s) . . . *Id.* (*citing* 20 C.F.R. §§ 404.1594(b)(1)(i), 416.994(b) (1)(i)). If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities . . . ' " *Id.* (*citing Kennedy*, 247 F.App'x at 765) (*quoting* 20 C.F.R. § 404.1594(b)(3)); *see also Nierzwick v. Commissioner of Social Security*, 7 F.App'x 358, 361 (6th Cir.2001)).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity. *Id.* (*citing Kennedy*, 247 F.App'x at 765). The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* (*citing* 20 C.F.R. § 404.1594(b)(5) and (f) (7)). The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (*citing* 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir.1991)). An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result of the increase, the claimant can perform his or her past work or other work that exists in significant numbers in the national economy. *Id.* (*citing* 20 C.F.R. §§

11

404.1594(f)(7), (8), 416.994(f)(7), (8)).

**2.     THE EIGHT-STEP EVALUATION PROCESS.**

There is no presumption of continuing disability. *Id.* at *9 (*citing Kennedy*, 247 F. App'x at 764) (*citing Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286–287 n. 1 (6th Cir.1994)). When deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner uses an eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(f)(1)-(8), to determine whether the claimant's disability has ended and if he or she is now able to work. *Id.* (*citing Kennedy*, 247 F. App'x at 764). The steps are:

1. Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter? If you do, your disability will be found to continue. *Id.* at *8.

2. If you do not, has there been medical improvement as defined in paragraph (b)(1)(i) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step 3 in paragraph (b)(5)(iii) of this section. If there has been no decrease in medical severity, there has been no medical improvement. ( See step 4 in paragraph (b)(5)(iv) of this section.) *Id.*

3. If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this section. If medical improvement is related to your ability to do work, see step 5 in paragraph (b)(5) (v) of this section. *Id.*

4. If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of this section. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process. *Id.*

12

5. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled. *Id.*

6. If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended. *Id.*

7. If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (b)(5)(vi) of this section and your age, education, and past work experience (see paragraph (b)(5) (viii) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues. *Id.* at *9.

8. We may proceed to the final step, described in paragraph (b) (5)(vii) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (b)(5)(vi) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph (b)(5)(vi) of this section. If we find that you may be unable to adjust to other work or if § 416.962 may apply, we will assess your claim under paragraph (b)(5)(vi) of this section and make a finding about whether you can perform your past relevant work. *Id.*

3. **THE EXCEPTIONS TO MEDICAL IMPROVEMENT.**

*First group of exceptions to medical improvement.* The law provides for certain limited situations when your disability can be found to have ended even though medical improvement has not occurred, if you can engage in substantial gainful activity. These exceptions to medical improvement are intended to provide a way of finding that a person is no longer disabled in those

limited situations where, even though there has been no decrease in severity of the impairment(s), evidence shows that the person should no longer be considered disabled or never should have been considered disabled. If one of these exceptions applies, we must also show that, taking all your current impairment(s) into account, not just those that existed at the time of our most recent favorable medical decision, you are now able to engage in substantial gainful activity before your disability can be found to have ended. As part of the review process, you will be asked about any medical or vocational therapy you received or are receiving. Your answers and the evidence gathered as a result as well as all other evidence, will serve as the basis for the finding that an exception applies.

(1) Substantial evidence shows that you are the beneficiary of advances in medical or vocational therapy or technology (related to your ability to work).
(2) Substantial evidence shows that you have undergone vocational therapy (related to your ability to work).
(3) Substantial evidence shows that based on new or improved diagnostic or evaluative techniques your impairment(s) is not as disabling as it was considered to be at the time of the most recent favorable decision.
(4) Substantial evidence demonstrates that any prior disability decision was in error.
(5) You are currently engaging in substantial gainful activity.

20 C.F.R. § 404.1594 (d) (1)-(5) (Thomson Reuters 2014).

*Second group of exceptions to medical improvement.* In addition to the first group of exceptions to medical improvement, the following exceptions may result in a determination that you are no longer disabled. In these situations the decision will be made without a determination that you have medically improved or can engage in substantial gainful activity.

(1) A prior determination or decision was fraudulently obtained. If we find that any prior favorable determination or decision was obtained by fraud, we may find that you are not disabled. In addition, we may reopen your claim under the rules in § 404.988. In determining whether a prior favorable determination or decision was fraudulently obtained, we will take into account any physical, mental, educational, or linguistic limitations (including any lack of facility with the English language) which you may have had at the time.

14

> (2) You do not cooperate with us. If there is a question about whether you continue to be disabled and we ask you to give us medical or other evidence or to go for a physical or mental examination by a certain date, we will find that your disability has ended if you fail, without good cause, to do what we ask.
>
> (3) We are unable to find you. If there is a question about whether you continue to be disabled and we are unable to find you to resolve the question, we will determine that your disability has ended.
>
> (4) You fail to follow prescribed treatment which would be expected to restore your ability to engage in substantial gainful activity.

20 C.F.R. § 404.1594(e) (1)-(4) (Thomson Reuters 2014).

Disability fraud includes but is not limited to exaggerating or knowingly lying about disabilities or any information related to a claim or eligibility for disability benefits. *McQuin v. Commissioner of Social Security,* 2014 WL 1369674, *9 (N.D.Ohio 2014). "If we find that any prior favorable determination or decision was obtained by fraud, we may find that you are not disabled." *Id.* Pursuant to 20 C.F.R. §§ 404.1594(e), 416.994(3), where there is a finding that a prior determination or decision was fraudulently obtained, "the decision will be made without a determination that you have medically improved . . . " *Id*.

## VI. SUMMARY OF THE ALJ'S DECISION.

Upon consideration of the entire record, the ALJ made the following FINDINGS OF FACT AND CONCLUSIONS OF LAW.

> 1. The most recent favorable medical decision finding that Plaintiff was disabled is the decision dated July 20, 2006, the comparison point decision (CPD).
>
> 2. At the CPD, Plaintiff had the following medically determinable impairments: (1) degenerative disc disease; (2) osteoarthritis; and (3) somatoform disorder. These impairments were found to result in a RFC that was unable to sustain work, eight hours per day and five days per week in a competitive work environment, even at a sedentary level.
>
> 3. Through June 1, 2008, the date Plaintiff's disability ended, Plaintiff did not have substantial gainful activity.

4. The medical evidence establishes that Plaintiff did not develop any additional impairments after CPD through June 1, 2008. There is no evidence of treatment or diagnosis for either osteoarthritis or somatoform disorder and Plaintiff continued to have only degenerative disc disease as a severe impairment.

5. Since June 1, 2008, Plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

6. There is no direct medical evidence of medical improvement but some of the evidence upon which the prior decision was based is fraudulent. This shows that Plaintiff's medical condition is not as severe as found in the prior decision.

7. Upon careful consideration of the entire record, the ALJ found that from June 1, 2008 through December 31, 2008, Plaintiff had the RFC to perform sedentary work except that he must be able to switch between sitting and standing every hour, he can never climb ladders, ropes, scaffolds, and can occasionally climb ramps and stairs, he must avoid hazards such as unprotected heights and dangerous machinery, he must have an additional and unscheduled break of 5-10 minutes per day and he would be off task 10% of the time.

8 Plaintiff's medical improvement is related to the ability to work because it resulted in an increase in Plaintiff's RFC.

9. From June 1, 2008 through December 31, 2008, Plaintiff's impairment was severe.

10. As of June 1, 2008, Plaintiff was capable of performing past relevant work.

11. As of June 1, 2008, considering Plaintiff's age, education, work experience and RFC, Plaintiff was able to perform a significant number of jobs in the national economy (Tr. 20-27).

## VII. STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a

16

scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id.* (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

### VIII. THE POSITION OF THE PARTIES.

Plaintiff argues that the investigator who identified him as a fraud suspect, wrote a report that is replete with innuendo and supposition. Nevertheless, the report is not evidence of medical improvement. Plaintiff further contends that there is no evidence of change in the severity of his impairments that existed at the time of his most recent favorable decision regarding disability. Therefore, the ALJ's analysis is not supported by substantial evidence and his case must be reversed and an award of benefits made.

Defendant responds that the issue is not whether Plaintiff experienced medical improvement. Rather, the regulations have an exception to medical improvement, i.e., situations where a determination was fraudulently obtained. Defendant further contends that Plaintiff obtained benefits based on fraud; therefore, he is not disabled.

## IX. ANALYSIS.

The exaggeration of symptoms and the inconsistencies among Plaintiff's claims, his medical records, and his responses to the investigation, resulted in a suspicion that the prior favorable decision was fraudulently obtained. Under the second tier exceptions, the Commissioner was not required to make a requisite medical improvement finding once he determined that a prior favorable decision was obtained by fraud. In fact, the Commissioner was empowered to order the cessation of benefits without a determination that Plaintiff had medically improved.

The ALJ suspected fraud and referred the case to the office of the OIG to conduct an investigation to determine if there was substantial evidence to support a finding of fraud. CDIU conducted an independent analysis of the record, interviewed Plaintiff and his neighbors and kept him under surveillance. The resulting investigation report dated October 9, 2007, indicated that Plaintiff understood the questions asked, he spoke in a clear and concise manner and he did not have any linguistic barriers. When ambulating, the investigator noticed that Plaintiff carried a cane but did not use it, that he was able to walk up and down the stairs without difficulty and that he had a normal gait (Tr. 287-288). Plaintiff alluded to his inability to bend yet third party witnesses observed that he drove and he maintained his own lawn. The investigator made a reasonable inference that Plaintiff could dress, bathe, eat, and go to the bathroom because he was dressed appropriately and his grooming was neat. The investigator emphasized that when making application for his license, Plaintiff did not disclose or list any mental or physical restrictions that would affect his driving.[4] The investigator also noted that the falsification of the application was a criminal act that could warrant further investigation, possible criminal prosecution or civil

---

[4] Later at the administrative hearing, Plaintiff testified that he could not sit or stand for more than 20 minutes, that he suffered from dizziness and occasionally he fainted.

monetary sanctions (Tr. 288).

The ALJ's suspicion of fraud was further supported by the inconsistencies in the medical evidence and Plaintiff's complaints as of June 1, 2008 and before December 31, 2008.  During this time, Plaintiff did not complain of or obtain treatment for osteoarthritis or somatoform disorder.  Plaintiff did continue to seek treatment for pain precipitated by his degenerative disc disease even though the medical records confirmed that such pain was controlled with Vicodin.  Dr. Yokiel confirmed that there was little clinical or diagnostic evidence that the symptoms were of the severity alleged.  The consultative psychologist determined that there were psychological factors affecting Plaintiff's pain in direct contrast to the treating psychologist who found no psychological factors that affected Plaintiff's experience of pain.

With a full and accurate understanding of the legal criteria, the ALJ performed a reasonable fraud risk assessment based on Plaintiff's behavior, testimony and material misrepresentations, the investigation results and the medical evidence.  The undersigned finds that substantial evidence supports  the ALJ's decision that Plaintiff exaggerated his disabilities and/or misrepresented information to sustain continued eligibility for benefits and that Plaintiff's disability ended on June 1, 2008.

## X.  CONCLUSION

For the foregoing reasons, this Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date:   May 8, 2014

19